STATE of Missouri, Respondent,

v.

William C. SALMON, Appellant.

No. WD 59916.

Missouri Court of Appeals,
Western District.

Oct. 8, 2002.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 26, 2002.

Wendell G. Jaco, Kansas City, MO, for
appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, MO, for respondent.

Before BRECKENRIDGE, P.J.,
LOWENSTEIN and SMART, JJ.

PATRICIA BRECKENRIDGE, Judge.

William Salmon was convicted by a jury of first degree murder, § 565.020, RSMo 2000,[1] and sentenced to life imprisonment without the possibility of parole. On appeal, Mr. Salmon alleges that his conviction should be reversed because the trial court erred by (1) admitting polymerase chain reaction short tandem repeat DNA (deoxyribonucleic acid) evidence without first holding a *Frye*[2] hearing; (2) denying his motion for judgment of acquittal since there was not sufficient evidence to support his conviction; and (3) instructing the jury on the lesser included offense of second degree murder. This court finds the evidence supported admission of the polymerase chain reaction short tandem repeat DNA evidence so Mr. Salmon was not prejudiced by the trial court's failure to hold a *Frye* hearing. The court further finds that there was sufficient evidence in the record to support both the verdict and the instruction for second degree murder. The judgment and sentence are affirmed.

**Factual and Procedural Background**

The facts viewed in the light most favorable to the jury's verdict are that, on September 5, 1990, Jan Lewis found her sister, Judith Pritchard, murdered inside a closet in Ms. Pritchard's home. Ms. Lewis called 911 and the police responded to Ms. Pritchard's house. The officers who responded to the house found that there was no forced entry into the house. The bed in the room Ms. Pritchard intended to rent was in slight disarray. When the blankets over Ms. Pritchard's body were removed, it was discovered that she was unclothed from the waist down and her top and bra had been pushed up over her breasts. Law enforcement officers collected evi-

dence that included a bedspread that was on Ms. Pritchard's bed.

The pathologist who performed the autopsy on Ms. Pritchard determined that Ms. Pritchard died on September 3, 1990. On the morning of September 3, 1990, Ms. Pritchard was scheduled to interview two people who were interested in renting a room that she had advertised. One person was a twenty-eight-year-old male who had something to do with Square D and 3M. Ms. Pritchard talked with her sister by phone at approximately 10:00 A.M. and told her that even though the man was supposed to be on his way to look at the room, she had decided that she did not want to rent to a man.

The other potential renter was Sharon Ralphs. At 11:00 A.M. on September 3, 1990, Ms. Ralphs went to Ms. Pritchard's home. No one answered the door, but Ms. Ralphs thought she heard voices inside. While waiting at Ms. Pritchard's house, Ms. Ralphs observed a white Chevy truck with wide maroon stripes down the sides that was parked in front of Ms. Pritchard's house. She noticed that it was a short-bed truck and had high-backed bucket seats. She also observed that there were decals in the back window of the truck. After five minutes, Ms. Ralphs went to make a telephone call to Ms. Pritchard. No one answered Ms. Ralphs' call.

A few days after the murder, Ms. Ralphs learned that Ms. Pritchard had been murdered. She phoned the police, and she told them that she was at Ms. Pritchard's house on the morning of September 3. She also told the police that she saw a truck parked in front of Ms. Pritchard's house. Within the next few days, the police took Ms. Ralphs around Columbia and showed her several pickup trucks.

---

1. All statutory references are to Revised Statutes of Missouri 2000.

2. *Frye v. U.S.,* 293 F. 1013 (D.C.Cir.1923).

Ms. Ralphs positively identified a truck in the parking lot where Mr. Salmon worked. The truck was a GMC, which had minimal differences from a Chevrolet. Ms. Ralphs identified the truck because it had wide maroon stripes, a short bed, high-backed bucket seats, and she recognized the decals in the back window. After investigating, the police discovered that the truck belonged to Mr. Salmon.

The police questioned Mr. Salmon. Mr. Salmon was a twenty-eight-year-old man. He was employed at Knernschield Manufacturing but he routinely made deliveries to 3M and Square D. The police officers told Mr. Salmon that they were investigating a crime and that a truck that looked like his truck had been seen in the area. When the officers asked Mr. Salmon for his address, he told them his address and then said, "Yeah, just a couple of blocks from—." He then said, "I mean a few blocks from where I work." At the time he made these statements, the officers had not told him that they were investigating the murder of Ms. Pritchard. Mr. Salmon lived six and a half miles from his place of business, but he lived five-eighths of a mile from Ms. Pritchard's home. While Mr. Salmon denied that he was at Ms. Pritchard's house on September 3, he was asked to provide hair and saliva samples, which he did.

At that time, the State did not bring charges against Mr. Salmon or anyone else. In late 1999, however, a police officer was reviewing the evidence that related to Ms. Pritchard's murder. The officer noticed that a stain had been found on the bedspread from Ms. Pritchard's bed that was found to be semen. Although the semen sample from the bedspread had been tested for blood types, it had not been submitted for DNA testing. The officer sent the sample to the Missouri Highway Patrol laboratory. The test that was used was the polymerase chain reaction (PCR) short tandem repeat (STR) DNA method.[3] The Missouri Highway Patrol laboratory had performed this method of DNA testing since April of 1999. The DNA test revealed a match with the hair and salvia samples Mr. Salmon gave in 1990.

Subsequently, the State charged Mr. Salmon with first degree murder for the murder of Ms. Pritchard. At a jury trial on March 6–7, 2001, Mr. Salmon was convicted of first degree murder. He was sentenced to life imprisonment without the possibility of probation or parole. This appeal follows.

### No Error in Admission of PCR STR DNA

### Evidence Without a *Frye* Hearing

In his first point on appeal, Mr. Salmon claims that the trial court erred in failing to hold a *Frye* hearing on the admissibility of PCR STR DNA profiling prior to admitting into evidence testimony that this DNA testing showed a match between the DNA

---

**3.** "STR testing is a particular method of PCR testing, and has been described as follows: A tandem repeat involves multiple copies of identical DNA sequence arranged in direct succession in a particular region of a chromosome. A short tandem repeat is a tandem repeat in which the repeat units are three, four, or five base pairs (a base pair has two complementary nucleotides). Loci containing STRs are scattered throughout the chromosomes in enormous numbers. Such loci have a fairly large number of alleles and are usually capable of unique identification. Accordingly, like PCR testing, STR testing uses PCR methods to greatly amplify a short segment of DNA, but involves amplification of loci containing sites." *State v. Butterfield,* 27 P.3d 1133, 1137 n. 2 (Utah 2001) (quoting *Commonwealth v. Rosier,* 425 Mass. 807, 685 N.E.2d 739, 742 (1997)).

in the semen stain on Ms. Pritchard's bedspread and Mr. Salmon's DNA. Mr. Salmon argues that a *Frye* hearing was required because no prior Missouri case has held that PCR STR DNA testing has been proven and independently verified as acceptable in the scientific community as a reliable source of scientific testing.

The *Frye* hearing that Mr. Salmon claims was required originated because Missouri follows the standard set forth in *Frye v. U.S.*, 293 F. 1013 (D.C.Cir.1923), to determine the admissibility of scientific evidence. "The long accepted standard for admissibility of results of scientific procedures enunciated in *Frye v. United States*, requires that such may be admitted only if the procedure is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.'" *State v. Davis*, 814 S.W.2d 593, 600 (Mo. banc 1991) (quoting *Frye*, 293 F. at 1014). Whether or not a procedure has gained acceptance in the relevant field and is admissible scientific evidence is established in a *Frye* hearing—that is a hearing held outside of the presence of the jury. *See Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993).

Here, the trial court did not hold a hearing outside the presence of the jury. Prior to the admission of any evidence concerning the testing of the semen stain, Mr. Salmon objected that the type of methodology used in this case for DNA testing has not been found to be scientifically reliable. Mr. Salmon argued that the evidence should not be admitted without a prior showing that the method of testing has been proved and independently verified. Specifically, Mr. Salmon stated in his objection:

> [M]y objection is that DNA evidence is not a scientifically reliable process. In particular realizing that the Ralph Davis case has held that. And that does not stand for that proposition. There has been a change in the technology and the evidence they are going to be presenting here today with regard to STR testing done by the Highway Patrol lab. In particular our concern is that there has not been proper verification of the independence of specific loci that they are using in this case. That was not involved in the Ralph Davis case. This is new technology. To my knowledge there is no case in the state of Missouri where this type of methodology has been proved and independently verified. It's my understanding that they intend to do that through this Mr. Kidd. But I believe that it has not been shown to do a, with scientifically reliable process under *Frye* and *Debler* [sic] and therefore I believe that the evidence should not be admitted without a prior showing that there has been independent testing, verification.

In response to Mr. Salmon's objection, the State argued,

> This is DNA PCR STR testing. I know I presented evidence to this effect on DNA PCR STR in the Kevin Tuggle case. We've gone through *Frye* hearings back Keith Vaughn in this circuit, DNA testing. Ralph Davis survived *Frye* hearings. This is generally accepted as being a reliable means of testing forensic evidence in the scientific community.

The court overruled Mr. Salmon's objection and allowed the State to present DNA evidence.

Mr. Salmon challenges this ruling on appeal. In his point relied on, he focuses on the trial court's failure to hold a *Frye* hearing—that is its failure to hear, outside the presence of the jury, foundation evidence before making its determination of whether the *Frye* standard was met. Al-

though the record clearly establishes that no hearing was held outside of the presence of the jury, Mr. Salmon would not be prejudiced by the court's failure to hold a *Frye* hearing, unless the evidence was improperly admitted because there was insufficient evidence to prove that the PCR STR method of DNA testing has gained general acceptance in the scientific community. In effect, then, it is necessary to consider whether there was sufficient evidence to prove that the PCR STR methodology of DNA testing is sufficiently established to have gained general acceptance in the scientific community. In resolving this issue, this court notes that "[i]t is within the trial court's sound discretion to admit or exclude an expert's testimony." *Davis*, 814 S.W.2d at 603.

The DNA evidence the State presented against Mr. Salmon came from two witnesses. The State first called Cary Maloney, a criminalist supervisor with the Missouri Highway Patrol. Mr. Maloney used the PCR STR method of DNA testing to compare the semen sample taken from Ms. Pritchard's bedspread with Mr. Salmon's saliva sample. Mr. Maloney testified that before the Missouri Highway Patrol lab began to utilize the new procedure, in April 1999, it spent approximately a year in validation and population studies. It adopted the PCR STR procedure because it has higher powers to discriminate between samples. The restriction fragment length polymorphism (RFLP) procedures previously utilized compared six loci, or separate areas of DNA, while the PCR STR process compares thirteen loci, plus the gender site. In addition, the PCR STR procedure is quicker, less susceptible to degradation in a sample, and more sensitive. Mr. Maloney testified that the PCR STR technique is generally accepted in the forensic scientific community.

As a result of the DNA analysis, Mr. Maloney concluded that "the sperm fraction from the bedspread material was consistent with the profile [he] received from William Salmon." Mr. Maloney used a database provided by the FBI to determine that the odds of someone else having the same DNA profile was one out of 3 quadrillion, 300 trillion. Mr. Maloney testified that the use of the FBI database to make statistical calculations is a generally accepted practice in the forensic scientific community.

The other witness the State called regarding the PCR STR DNA testing was Dr. Kenneth Kidd. Dr. Kidd is a professor in the genetics department of Yale's school of medicine. At Yale, Dr. Kidd has his own lab where he and fourteen others work on research primarily concerning human DNA. He testified that the PCR STR method of DNA testing is generally accepted in the scientific community. Specifically, he stated that "it's accepted broadly in the forensic community and it's a technique that's used in research labs and medical testing labs hundreds of thousands of times a day in labs all around the world." He and others at Yale have done a large number of statistical analyses that involve "determining the frequencies of differing varying forms in a population and comparing populations around the world." Dr. Kidd stated that he was qualified to testify concerning the techniques for PCR STR DNA testing and how they are applied, and he was within the few dozen of the most qualified in the world to testify to the interpretation of the results.

Dr. Kidd then testified that he reviewed the PCR STR testing conducted by Mr. Maloney at the Missouri State Highway Patrol Laboratory. He found Mr. Maloney to be well qualified to perform the PCR STR testing and the procedures and techniques applied by Mr. Maloney to be

"absolutely standard." In fact, Dr. Kidd testified that the techniques used by Mr. Maloney were the same techniques applied in Dr. Kidd's laboratory. Dr. Kidd was questioned about the significance of the fact that the DNA sperm sample taken from Ms. Pritchard's bedspread and the DNA saliva sample from Mr. Salmon were obtained in 1990 but not tested until 2000. He stated that the test of whether degradation of DNA has occurred is whether or not one can get a PCR result. Since results were obtained from the DNA samples, it was his opinion that "[t]here was perfectly adequate material remaining to get a very clear result."

With regard to the results obtained from the DNA testing, Dr. Kidd agreed with Mr. Maloney's conclusion that the DNA profile from the sperm fraction of the bedspread was indistinguishable from Mr. Salmon's DNA. He further agreed with the statistical calculations made by Mr. Maloney and the conclusion that the calculations "provided a clear estimate" that the matched DNA profile is "exceedingly rare." Finally, he testified that it was a generally accepted practice in the forensic scientific community to use the FBI database, as used by Mr. Maloney, to make such calculations.

The issue for this court is whether this evidence is sufficient to meet the *Frye* standard, as that standard has been applied to DNA evidence in Missouri. In *Davis*, the Supreme Court applied the *Frye* standard to DNA evidence to first find that DNA testing is generally accepted in the scientific community. 814 S.W.2d at 602–03. The Court in *Davis*, however, was addressing the RFLP technique of DNA testing. *Id.* at 602. Subsequent to *Davis*, Missouri courts have accepted the PCR technique of DNA testing. *See State v. Brown*, 949 S.W.2d 639, 641 (Mo.App.1997); *State v. Hoff*, 904 S.W.2d

56, 59 (Mo.App.1995). No Missouri court, however, has addressed the PCR STR technique of DNA testing.

Here, Mr. Maloney and Dr. Kidd testified that the PCR STR technique of DNA testing is generally accepted in the scientific community. Numerous other jurisdictions have found the PCR STR method of DNA testing to be generally accepted in the scientific community and the test results admissible. *See People v. Allen*, 72 Cal.App.4th 1093, 85 Cal.Rptr.2d 655, 658–660 (1999); *People v. Shreck*, 22 P.3d 68, 83 (Colo.2001); *Lemour v. State*, 802 So.2d 402, 408 (Fla.Dist.Ct.App.2001); *State v. Rokita*, 316 Ill.App.3d 292, 249 Ill.Dec. 363, 736 N.E.2d 205, 211 (2000); *Commonwealth v. Rosier*, 425 Mass. 807, 685 N.E.2d 739, 743 (1997); *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317, 325 (1998); *People v. Owens*, 187 Misc.2d 838, 725 N.Y.S.2d 178, 180–81 (N.Y.Sup.Ct.2001); *State v. Butterfield*, 27 P.3d 1133, 1143 (Utah 2001). Therefore, this court holds that the PCR STR technique is generally accepted in the scientific community. Since the PCR STR DNA test results are admissible under the *Frye* standard, Mr. Salmon was not prejudiced by the trial court's admission of the evidence without holding a *Frye* hearing. This point is denied.

### Sufficient Evidence Supports the Verdict

■ In his second point on appeal, Mr. Salmon alleges that the evidence was insufficient for a reasonable juror to find him guilty beyond a reasonable doubt. Mr. Salmon claims that the State's case was based solely upon the circumstantial evidence that Ms. Ralphs saw Mr. Salmon's truck in Ms. Prichard's driveway and DNA evidence that was tested by procedures that no Missouri court has found to be scientifically reliable. Mr. Salmon con-

tends that Ms. Ralphs' testimony could not convince a reasonable juror that Mr. Salmon murdered Ms. Pritchard because she claimed that the truck was a Chevy and Mr. Salmon's truck was a GMC. Mr. Salmon also contends that the DNA evidence could not convince a reasonable juror that he was guilty. He claims that a reasonable juror could have questioned the integrity of the test because it was not done for ten years.

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, this court's review is limited to determining whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993). The evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the jury's verdict. *Id.* All contrary inferences are disregarded. *Id.* Reasonable inferences may be drawn from both direct and circumstantial evidence. *See id.* at 412–13. However, the inferences must be logical, reasonable, and drawn from established fact. *State v. Friend,* 936 S.W.2d 824, 828 (Mo.App. 1996).

The evidence, viewed in the light most favorable to the jury's verdict, was that Ms. Ralphs identified Mr. Salmon's truck at Ms. Pritchard's house on the morning of the murder. It was a distinctive truck in that it was a short-bed truck with wide maroon stripes, high-backed bucket seats, and decals in the back window. Even though Ms. Ralphs mistook the GMC truck for a Chevy, there are only minimal differences between the two.

There was additional evidence that, on the morning of the murder, Ms. Pritchard was expecting a visit from a man who had called about renting a room. The man was twenty-eight years old and had something to do with Square D and 3M. Mr. Salmon was twenty-eight years old at that time, and his employment caused him to make deliveries to Square D and 3M. When Mr. Salmon was questioned by police and asked about his home address, he told them his address and then said, "Yeah, just a couple of blocks from—." He then said, "I mean a few blocks from where I work." At the time he made these statements, the officers had not told him that they were investigating the murder of Ms. Pritchard. Mr. Salmon lived six and a half miles from his place of business, but he lived five-eighths of a mile from Ms. Pritchard's home.

Although Mr. Salmon claimed that he did not know Ms. Pritchard and had not been to her home, the DNA from the semen on Ms. Pritchard's bedspread matched Mr. Salmon's DNA. Two experts for the State, Mr. Maloney and Dr. Kidd, testified that the DNA test was scientifically reliable and generally accepted in the scientific community. Contrary to Mr. Salmon's argument that the age of the two DNA samples made the test results questionable, Dr. Kidd testified that "[t]here was perfectly adequate material remaining to get a very clear result." The two experts also testified that the odds of someone other than Mr. Salmon having the same DNA profile were one out of 3 quadrillion, 300 trillion.

This evidence and the reasonable inferences to be drawn therefrom are sufficient to support a reasonable juror's finding that Mr. Salmon was guilty beyond a reasonable doubt. Mr. Salmon's second point is denied.

### No Error in Giving Second Degree Murder Instruction

In his third and final point on appeal, Mr. Salmon claims that the trial court erred in instructing the jury on the offense

of second degree murder. He contends that his defense was that he was not at Ms. Pritchard's house on the day of the murder and that the second degree murder instruction weakened his theory of the case because second degree murder is murder arising out of passion.

██ At trial, the court instructed the jury on both first and second degree murder. "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." Section 565.020.1. The crime of second degree murder can be committed under subparagraph (1) of § 565.021.1 if a person "[k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person." Second degree murder is a lesser-included offense of first degree murder. Section 565.025.2(1)(a).

██ If there is evidence that could result in a conviction of a lesser-included offense and a party or the court desires the instruction, the court is obligated to give the instruction to the jury. *State v. Redmond,* 937 S.W.2d 205, 208 (Mo. banc 1996). Here, the State requested the second degree murder instruction, so the remaining question is whether there is evidence that could result in a conviction of that offense. On this issue, the Supreme Court held in *State v. Santillan,* that, generally, evidence of first degree murder is also evidence that could result in a conviction for second degree murder, since the jury may find that the defendant did not deliberate. 948 S.W.2d 574, 576 (Mo. banc 1997). The Court stated that:

The difference between first and second degree murder is the element of deliberation. For a conviction of first degree murder, the state must prove beyond a reasonable doubt that the defendant deliberated when he caused the death of another. Deliberation is a mental state and is difficult to prove through direct evidence. "[T]he mental elements establishing murder may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding" the offense. In most cases, indirect evidence of deliberation also supports a finding of lack of deliberation. A jury may draw different inferences from the facts on the issue of whether the defendant deliberated. Deliberation is, therefore, a question of fact for the jury and a second degree murder instruction is usually warranted.

*Id.* (internal citations omitted).

Since there was no direct evidence of what transpired immediately before Mr. Salmon murdered Ms. Pritchard, a reasonable juror might have believed that the State did not prove the element of deliberation for first degree murder. Consequentially, the evidence would have supported a conviction of the lesser-included offense of second degree murder. An instruction for second degree murder was warranted, and the trial court did not err in giving the instruction. Accordingly, Mr. Salmon's third point is denied.

The judgment and sentence of the trial court are affirmed.

All concur.