NO. 5-99-0453

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Jackson County.

)

v. )  No. 93-CF-501

)

FREDERICK M. ROKITA, )  Honorable

)  David W. Watt, Jr.,

     Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE RARICK delivered the opinion of the court:

The defendant, Frederick M. Rokita, was convicted in the circuit court of Jackson County of five counts of aggravated criminal sexual assault and one count each of home invasion, residential burglary, and theft, all arising out of an attack on C.S.

At a bench trial held on May 9, 1994, and presided over by the Honorable David W. Watt, Jr., C.S. testified that in the early morning hours of November 13, 1993, she was awakened by the sound of dishes rattling in the kitchen of her mobile home.  When she got out of bed to investigate, she saw a man standing at the end of the hallway.  He grabbed her and ordered her into the bedroom.  C.S. testified that she had the opportunity to observe her attacker for 15 to 20 minutes.

During the sexual assault that followed, C.S. could not see her attacker because either she had her eyes closed or her face was covered by bedding.  C.S. testified that her attacker did not ejaculate.  At some point, C.S. escaped and ran to a neighbor's trailer for help.  As she was knocking on the door, her assailant came toward her and stood several feet from her for a period of 30 to 40 seconds.

Several days after the attack, C.S. assisted a sketch artist in preparing a composite sketch of her attacker.  On November 23, 1993, Rokita was arrested by a Carbondale police officer who noticed a resemblance between Rokita and the sketch.

Prior to Rokita's arrest, C.S. had described her attacker as wearing a plaid shirt.  Following Rokita's arrest, the police executed a search warrant of Rokita's home and found two pictures of him wearing a plaid shirt.  When shown the photographs, C.S. recognized Rokita as her attacker, and she recognized the plaid shirt he was wearing in the photograph as being the shirt her attacker had worn.

Peggy Huffstotler, a neighbor of C.S.'s, testified that around 5 a.m. on November 13, 1993, she was awakened by a knock on the door.  She answered the knock and spoke through her screen door for about five minutes with a man whom she identified as Rokita.  Huffstotler testified that the man asked if "Jason" lived there.  Huffstotler further testified that the man returned about 30 minutes later, knocked on her door again, and shouted obscenities.

Chris Stark testified that he had allowed Rokita to stay in his mobile home for a short time prior to November 12, 1993.  Stark stated that around 3 a.m. on November 13, 1993, he and Rokita had an argument.  Rokita left and walked off in the direction of Carbondale, toward C.S.'s trailer park.  Stark last saw Rokita about a mile from the trailer park.

Shortly after the attack, C.S. was taken to the hospital, where sexual assault evidence was taken, including vaginal and rectal swabs, as well as blood and saliva samples.  Sperm cells were found on the rectal swab.  No sperm cells were found on the vaginal swab, but it tested positive for the presence of semen.  Samples from vaginal and rectal swabs, as well as blood-stain samples from both Rokita and C.S., were forwarded to the Illinois State Police Forensic Science Laboratory in Springfield, Illinois (State lab), for deoxyribonucleic acid (DNA) testing.

The State lab attempted to perform a type of DNA testing known as "restriction fragment length polymorphism" (RFLP) on the samples.  The RFLP procedure failed to develop a DNA profile on the material from the rectal swab.  With respect to the material from the vaginal swab, the only DNA profile the RFLP procedure was able to develop was that of C.S.  David Metzger, the scientist from the Springfield lab who performed the RFLP analysis, testified that the RFLP procedure requires a certain quality of DNA in order to develop a profile and that RFLP analysis tends to be more successful in developing a profile from seminal material in those cases where ejaculation has occurred.

At the conclusion of the trial, Rokita was found guilty on all counts.  He was sentenced to a total of 80 years' imprisonment.  In an order pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23), this court vacated Rokita's conviction for residential burglary but affirmed the case in all other respects.  
People v. Rokita
, 284 Ill. App. 3d 1153, 708 N.E.2d 1289 (1996).  Rokita's petition for leave to appeal to our supreme court was denied.  
People v. Rokita
, 175 Ill. 2d 549, 689 N.E.2d 1145 (1997).

While his petition for leave to appeal was pending, Rokita filed a 
pro se
 petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-2.1 (West 1996)).  On April 15, 1997, the circuit court dismissed the petition as frivolous and patently without merit.  Rokita's appeal of the dismissal of his postconviction petition was dismissed by this court for want of prosecution.  
People v. Rokita
, No. 5-97-0285 (June 30, 1998) (unpublished order).

On April 14, 1999, Rokita filed a motion for forensic testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 1998)).  Rokita's motion and supporting memorandum alleged that he has satisfied the requirements for obtaining postconviction DNA testing set forth in section 116-3:  (1) identity was a central issue in his trial, (2) the evidence to be tested had been subject to a chain of custody sufficient to establish that it had not been substituted, tampered with, replaced, or altered in any material respect, (3) the result of DNA testing based on a "polymerase chain reaction" (PCR) had the scientific potential to produce new, noncumulative evidence materially relevant to Rokita's assertion of actual innocence, and (4) PCR-based DNA testing was generally accepted within the relevant scientific community.

Hearings on Rokita's motion were held on May 5, 1999, and on June 3, 1999, before the Honorable David W. Watt, Jr., the same judge who had presided at his bench trial.  At the May 5, 1999, hearing, the State argued that although the State lab was not doing PCR testing at the time of Rokita's trial, such testing was available at private laboratories.  Although Rokita's motion and supporting memorandum referred only to PCR-based DNA testing, a review of the transcript of the June 3, 1999, hearing reveals that what Rokita sought was a particular type of PCR testing known as short tandem repeat (STR).  During the hearing, the State acknowledged that Rokita had met three of the requirements of section 116-3:  misidentification was the basis of Rokita's defense and was the issue at the trial, the evidence to be tested was subject to a proper chain of custody, and while the STR-based DNA testing sought by Rokita had been unavailable at the time of his trial in 1994, at the time of the hearing it was generally accepted in the scientific community.

The trial court found that identity was an issue in Rokita's trial, that the chain of custody had been established, and that the test requested is generally accepted in the relevant scientific community.  The court denied Rokita's motion, however, finding that the result of the testing did not have the potential to produce new, noncumulative evidence relevant to Rokita's assertion of actual innocence.  The judge stated that this had been a simple identification case and that DNA had little to do with the finding of guilt.  The judge reasoned that even if the DNA testing revealed that Rokita was not the source of the seminal material, C.S.'s identification of Rokita was clear and certain and that, given the evidence, any result of the DNA testing would not have altered the outcome of the trial.  The court also expressed its concern that Rokita was utilizing section 116-3 in an effort to file a second postconviction petition and that defendants might continually seek DNA testing under section 116-3 each time a new DNA test was developed, resulting in a lack of finality to their convictions.  The court was concerned that, in effect, defendants would be using section 116-

3 to obtain multiple postconviction hearings.  The judge further indicated that should he be reversed and the case remanded, it should be assigned to another judge, because he was certain of Rokita's guilt.

On appeal, Rokita argues that he has satisfied all of the requirements of section 116-3 and that the trial court erred in determining that the result of testing did not have the potential to produce new, noncumulative evidence relevant to his assertion of actual innocence.  Rokita also contends that the trial court erred in requiring him to meet criteria not contained in the statute in order to obtain DNA testing.  Specifically, he contends that the trial court mistakenly believed that it could grant the motion only if Rokita could show that the finding of guilt might have been erroneous and that there was no time limit for a section 116-3 motion.

Section 116-3 provides:

"(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of fingerprint or forensic DNA testing on evidence that was secured in relation to the trial which resulted in his or her conviction, but which was not subject to the testing which is now requested because the technology for the testing was not available at the time of [the] trial.  Reasonable notice of the motion shall be served upon the State.

(b) The defendant must present a prima facie case that:

(1) identity was the issue in the trial which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

(c) The trial court shall allow the testing under reasonable conditions designed to protect the State's interests in the integrity of the evidence and the testing process upon a determination that:

(1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence;

(2) the testing requested employs a scientific method generally accepted within the relevant scientific community."  725 ILCS 5/116-3 (West 1998).

Prior to the analysis of Rokita's arguments, a brief discussion of DNA testing is in order.  Within the nucleus of each human cell are 23 pairs of chromosomes composed of deoxyribonucleic acid, or DNA, which contains the coded information that provides the genetic blueprint that determines the physical structure and characteristics for each individual.  With the exception of identical twins, no two individuals have the same DNA structure, and the DNA contained in one cell of an individual will be identical to the DNA contained in every other cell of that individual.

A DNA molecule is shaped like a double helix, resembling a twisted ladder or spiral staircase.  The sides of the ladder are composed of phosphate and sugar molecules.  The rungs are composed of a pair of organic compounds called nucleotides, or bases.  There are four bases:  adenine (A), guanine (G), cytosine (C), and thymine (T).  Two bases form a single rung called a base pair.  Because of their chemical composition, T always pairs with A, and G always pairs with C.  This strict complementary pairing means that the order, or sequence, of bases on one side of the ladder will determine the sequence of the other side.  The order in which these base pairs appear in the ladder is the genetic code of that individual.

A sequence of base pairs responsible for producing a particular trait is called a gene.  A gene may be composed of anywhere from several thousand to several million base pairs.  The total number of base pairs in a set of 23 chromosomes, one chromosome from each pair of chromosomes in a cell, is about three billion.  Because human beings share many more biological similarities than differences, 99.9% of the DNA molecule, or base-pair sequences, in each human being are the same.  Certain sections of the DNA ladder take different forms in different individuals.  These areas of variation are called "polymorphisms."  The total fragment length of the polymorphism is determined by the number of repeat core sequences of base pairs.  These are called "variable number of tandem repeats."  The position a gene or other DNA fragment occupies on the DNA ladder is called its "locus."  Certain types of genes are polymorphic and can occur in alternating forms, each of which is capable of occupying the gene's locus.  These alternate forms of genes are called "alleles" and are highly variable from one person to another.

There are various types of DNA technologies:  (1) "multilocus probe testing," better known as DNA fingerprinting, (2) "single-locus restriction fragment length polymorphism" (RFLP), (3) "polymerase chain reaction," or PCR, using "amplified length polymorphism" (AMPLFP), (4) PCR testing using dot blot technology, and (5) mitochondrial DNA sequencing.  C. Strom, 
Genetic Justice:  A Lawyers Guide to DNA Testing
, 87 Ill. B.J. 18-25 (1999).  The testing Rokita seeks in the present case is a type of PCR-AMPLFP testing known as "short tandem repeat" (STR).

Turning to the merits of Rokita's argument, we note that with respect to subsection (a) of section 116-3, Rokita did not allege in his motion or in the supporting memorandum that STR-based PCR testing was unavailable at the time of his trial.  Indeed, neither the motion nor the supporting memorandum even mentions STR-based PCR testing.  They refer only to PCR testing generally, and they do not even allege that PCR testing was unavailable at the time of the trial.  At the hearing on his motion, Rokita introduced no evidence demonstrating when STR-based PCR testing first became available.

Although Rokita failed to provide any evidence of the unavailability of STR testing at the time of the trial, we note that at the hearing on Rokita's motion, the State conceded that at the time of the trial PCR testing was in its infant stages and that STR-based PCR testing did not exist.  The State cannot now deny on appeal a fact it admitted in the trial court.  In its reply brief, the State now argues that PCR testing was available at the time of Rokita's trial in 1994.  The State contends, "PCR-based DNA testing was developed in 1985, and '[b]y 1990, the PCR method was one of the most widely used techniques in medical and biological research,' " quoting 
People v. Pope
, 284 Ill. App. 3d 695, 697, 672 N.E.2d 1321, 1323 (1996).  The State's argument is correct but is not relevant.  As Rokita notes, while an early form of PCR-based DNA testing, known as DQ-Alpha typing, the type of PCR testing at issue in 
Pope
, was in use around the time of his trial, STR-based PCR testing was not.  We note that while the State argues that PCR testing was available at the time of Rokita's trial, it does not argue that 
STR-based
 PCR testing was available, which is what Rokita was seeking.    

With respect to subsection (b) of section 116-3, Rokita contends that the trial court correctly found that he made a 
prima facie
 case that identity was the issue in his trial and that the evidence to be tested has been subject to a proper chain of custody.  Rokita notes that the State disputed neither of these at the hearing.  The State advances no argument on appeal with respect to the chain of custody, but it now contends that identity was not 
the
 issue on appeal.  Again, the State now attempts to argue a fact that it conceded at the hearing.  Further, a review of the transcript of Rokita's trial demonstrates that the State's assertion is incorrect.  The basis of Rokita's defense at his trial was that he was not the person who assaulted C.S.  In his closing argument, defense counsel stated, "[I]t's our belief that this is simply a case of mistaken identity."  Clearly, identity was the issue at the trial.  The trial court correctly found that Rokita fulfilled the requirements of subsection (b) of section 116-3.

With respect to subsection (c), we note that the State does not dispute that STR-based DNA testing is now generally accepted in the relevant scientific community.  The focus of our inquiry, therefore, will be on whether the trial court erred in finding that the result of the requested testing did not have the potential to produce new, noncumulative evidence materially relevant to Rokita's assertion of actual innocence.  Reviewing the transcript of the hearing, it is evident that, in denying Rokita's motion, the circuit court based its decision on a factor not contained in the statute.  Specifically, the court stated that even if DNA testing demonstrated that the seminal material did not come from Rokita, such evidence would not alter the court's opinion of his guilt.  The ultimate impact of the new, noncumulative evidence on the defendant's conviction is not relevant to the determination of whether a defendant is entitled to such testing, and the trial court erred in denying the motion on this basis.

Rokita contends that STR-based PCR testing has the potential to produce new, noncumulative evidence materially relevant to his assertion of actual innocence.  Specifically, he contends that such testing can produce a genetic profile from a much smaller sample of genetic material than is required for successful RFLP testing.  The State does not contest this assertion.  Rather, the State maintains that because C.S.'s attacker did not ejaculate when assaulting his victim, the results of any DNA test would not have been conclusive.  Thus, the State maintains, the results would not be materially relevant to his claim of innocence.  In support of its argument, the State relies on 
People v. Savory
, 309 Ill. App. 3d 408, 722 N.E.2d 220 (1999).

In 
Savory
, the defendant was convicted of two counts of murder.  He filed a section 116-3 motion seeking DNA testing of blood from a pair of pants and of fingernail scrapings.  The defendant argued that the testing would prove that the blood on his pants did not come from the victim and that any DNA recovered from under the victim's fingernails did not come from him.  The trial court denied the motion.  In affirming the trial court's decision, the court in 
Savory
 held that because the results of the testing could not conclusively exonerate the defendant, the evidence sought was not materially relevant to his assertion of actual innocence.  The court in 
Savory
 reasoned that by using the term "actual innocence," the legislature intended to limit the scope of section 116-3 to allow scientific testing only where it has the potential to exonerate a defendant.

In reaching this conclusion, the court in 
Savory
 relied primarily on 
People v. Gholston
, 297 Ill. App. 3d 415, 697 N.E.2d 375 (1998).  In 
Gholston
, the defendant was one of six persons convicted of sexually assaulting the victim.  The defendant filed a petition for postconviction relief, seeking DNA testing of the victim's sexual assault kit.  The trial court denied his petition, and the defendant appealed.  The court in 
Gholston
 first noted that our supreme court had recognized the viability of a free-standing postconviction claim of actual innocence based upon newly discovered evidence but had held that the evidence supporting such a claim must be new, noncumulative, and most importantly, of such conclusive character as would probably change the result of the trial.  
Gholston
, 297 Ill. App. 3d at 419, 697 N.E.2d at 378, citing 
People v. Washington
, 171 Ill. 2d 475, 665 N.E.2d 1330 (1996). Based thereon, the court in 
Gholston
 held that even if the defendant's DNA did not match that taken from the victim, such a result could not conclusively establish that the defendant had not sexually assaulted the victim, because there were multiple attackers and there was no testimony that the defendant had ejaculated.  Thus, the court concluded, the results of the DNA test would not be material to his claim of actual innocence. 

The 
Savory
 court's reliance on 
Gholston
 is misplaced.  
Gholston
 involved a postconviction petition claim of actual innocence based upon new evidence.  In 
Washington
, upon which 
Gholston
 relied, our supreme court held that a claim of newly discovered evidence showing a defendant to be actually innocent was cognizable as a matter of due process and could be raised in a postconviction petition.  
Washington
, 171 Ill. 2d at 489, 665 N.E.2d at 1337.  Because the relief sought in a postconviction petition is a new trial, the standards for determining whether to grant a new trial based upon newly discovered evidence govern whether a postconviction petition alleging newly discovered evidence should be granted.  See 
Washington
, 171 Ill. 2d at 489, 665 N.E.2d at 1337.  A new trial based upon newly discovered evidence will be granted only where such evidence is of "such conclusive character that it will probably change the result on retrial."  
People v. Silagy
, 116 Ill. 2d 357, 368, 507 N.E.2d 830, 834 (1987), quoting 
People v. Molstad
, 101 Ill. 2d 128, 134, 461 N.E.2d 398, 402 (1984).  Thus, it was appropriate for the court in 
Gholston
 to affirm the dismissal of the postconviction petition because the evidence was not of such a conclusive character as would probably change the result on a retrial.  A section 116-3 motion does not seek a new trial, however, but merely forensic testing.  Thus, the rationale employed in 
Gholston
 does not support the holding in 
Savory
.

Moreover, the 
Savory
 court's interpretation of section 116-3 ignores the plain language of the statute.  Section 116-3 does not require that the requested DNA testing produce evidence of such a conclusive character as would probably change the result on a retrial.  Instead, the statute requires only that it has the "
potential
 to produce new, noncumulative evidence 
materially relevant
 to the defendant's assertion of actual innocence."  (Emphasis added.)  725 ILCS 5/116-3(c)(1) (West 1998).  Words in statutes are to be given their plain and ordinary meaning, and when the intent of the legislature can be ascertained from the language of the statute itself, such language will be given effect without resorting to other aids for construction.  
People v. Bryant
, 128 Ill. 2d 448, 539 N.E.2d 1221(1989).  As the dissent in 
Savory
 correctly observed, the plain and unambiguous language evinces no legislative intent to limit the use of scientific testing only to situations where the testing will result in total vindication or has the potential to exonerate the defendant.  See 
Savory
, 309 Ill. App. 3d at 416-17, 722 N.E.2d at 226 (Holdridge, J., dissenting).  Had the legislature intended to limit testing to such situations, it could easily have done so.  Instead, it chose to allow testing in any case where the result might be materially relevant.  

The testing sought in this case clearly meets that standard.  The RFLP method was unable to produce a definitive result because of the size of the sample.  The DNA testing method sought by Rokita can obtain results from a much smaller sample.  A conclusive determination of whether Rokita's DNA matches the sample taken from the victim would be both new and noncumulative and would be materially relevant to his assertion of actual innocence.

The State also argues that section 116-3 should be interpreted in a way that will limit the circumstances under which a section 116-3 motion can be brought and, if denied, subsequently appealed.  Specifically, the State urges this court to impose a time limitation on a defendant's ability to seek forensic testing pursuant to section 116-3 and urges us to follow the reasoning in 
People v. Dunn
, 306 Ill. App. 3d 75, 713 N.E.2d 568 (1999), and hold that a section 116-3 motion is properly considered only in connection with a timely postconviction petition or one that is excusably late.

In 
Dunn
, the defendant filed a 
pro se
 postconviction hearing petition.  During the pendency of the petition, the public defender appointed to represent Dunn filed, then withdrew, a motion to compel genetic testing.  Ultimately, the trial court dismissed his postconviction petition with prejudice.  On December 1, 1998, Dunn filed an affidavit in the form of a supplemental record with the appellate court, in which he averred that he had only recently learned that his motion to compel genetic testing had been withdrawn.  

On appeal, the court granted the State's motion to strike the affidavit because it violated Supreme Court Rule 329 (134 Ill. 2d R. 329), which allows for the correction of material omissions or inaccuracies in the record.  The court nevertheless considered Dunn's request for genetic testing because it was raised by Dunn's correspondence and by defense counsel before it was withdrawn.  Noting that section 116-3 was not in effect at the time Dunn filed his postconviction petition, the court evaluated Dunn's claim under the fundamental fairness exception to the waiver rule.  Citing the accuracy and definitiveness of DNA testing and the recent enactment of section 116-3, the court remanded the cause to the circuit court for a determination of whether he had made a 
prima facie
 case for such testing and for further proceedings, if necessary, consistent with those results.

Contrary to the State's assertion, nothing in 
Dunn
 implies that the proper time for filing a section 116-3 motion is during a postconviction review.  As noted above, when interpreting a statute, courts should give effect to the intent of the legislature, and that intent is best ascertained from the language of the statute itself.  There is no language in section 116-3 indicating any legislative intent to impose a time limit for filing a motion for forensic testing.  Had the legislature wished to impose a time limit on the filing of a section 116-3 motion, it could easily have done so.  It is not the prerogative of this court to read into the statute limitations that the legislature chose not to include.  Moreover, were we to go beyond the clear and unambiguous language of the statute, the legislative history of section 116-3 clearly demonstrates that the legislature did not intend to impose a time limit for filing a motion.  See 90th Ill. Gen. Assem., House Proceedings, April 15, 1997, at 1-20; 90th Ill. Gen. Assem., Senate Proceedings, May 9, 1997, at 106-07.

[Nonpublishable material removed under Supreme Court Rule 23 (166 Ill. 2d R. 23).]

For the forgoing reasons, the judgment of the circuit court of Jackson County is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed; cause remanded.

GOLDENHERSH, P.J., and WELCH, J., concur.