Sally Pistorio MCGRATH and
John McGrath, Plaintiffs,

v.

NASSAU HEALTH CARE CORP. and
Eric S. Rosenblum, Defendants.

No. CV 00–6454(TCP)(WDW).

United States District Court,
E.D. New York.

June 25, 2002.

Steven Ian Locke, Carabba, Locke & Olsen, LLP, New York City, for Plaintiffs.

Brian Joseph Clark, Clifton, Budd & Demaria, LLP, New York City, for Nassau Health Care Corp.

Peter L. Altieri, Ann L. Moscow, Epstein, Becker & Green, PC, New York City, for Eric S. Rosenblum.

## ORDER

WALL, United States Magistrate Judge.

By letter dated May 6, 2002, the plaintiffs moved for a protective order precluding any use of a blanket purportedly stained with the

menstrual blood of plaintiff Sally McGrath ("McGrath"). By letter dated May 9, 2002, the individual defendant, Eric Rosenblum, cross-moved for an order directing McGrath to produce a DNA sample. By letter dated May 9, 2002, the hospital defendant, Nassau Health Care Corp. ("NHCC"), supported Rosenblum's motion and presented its position on the issues.

In an order dated May 22, 2002, the undersigned set the matter down for a hearing on June 11, 2002, and directed the parties to submit affidavits and memoranda of law in support of their arguments. The parties submitted the appropriate supporting papers and appeared for oral argument and a hearing on June 11.

As ordered on the record at the conclusion of the hearing on June 11, and for the reasons set forth herein, the undersigned grants the defendant's cross-motion and denies the plaintiffs' motion.

## BACKGROUND

This lawsuit, in which the plaintiffs claim that Rosenblum sexually harassed Sally McGrath in the workplace during 1999 and 2000, was commenced in October 2000. The blanket at issue on these motions was first mentioned at McGrath's deposition on April 30, 2002. Rosenblum claims that the blanket was stained with McGrath's menstrual blood when he and McGrath engaged in consensual sexual intercourse on it, and that it will provide a basis for impeaching McGrath's testimony that she and Rosenblum never had a consensual sexual relationship.

On February 22, 2002, McGrath responded to a question in Rosenblum's Second Set of Interrogatories by stating that "Plaintiff never engaged in sexual relations with Defendant Rosenblum." Locke Letter, 5/6/02, Exh. B at 4. During her deposition on March 7, 2002, McGrath was asked whether she "at any time ha[d] any consensual sexual contact of any kind with Eric Rosenblum," and she answered, "No, I did not." See Def. NHCC'S Mem. of Law in Supp. of App. for DNA Testing, Exh. C at 154, ll. 23–25. That same day, Rosenblum's lawyers, who allegedly had been in possession of the blanket for some undetermined period of time, sent it to Laboratory Corporation of America (LabCorp.) for preliminary testing. See Moscow Aff. in Supp., at ¶ 5.

At his deposition on March 25, 2002, Rosenblum stated, apparently for the first time in the litigation record, that he and McGrath had engaged in consensual sex. Locke Letter, 5/6/02, Exh. D at 131. He testified that the affair lasted for two to three weeks in late November and early December of 2000, and that he broke it off. Id. at 150–52. All of their sexual encounters, Rosenblum claimed, took place in a building on the hospital's property known as the "CEO House." Id. at 150.

At the June 11th hearing, Rosenblum testified at length about one of the alleged sexual encounters that occurred in the CEO House. On an unspecified date, he claims [1], he and McGrath went to the house intending to have sexual intercourse, and McGrath told him she was menstruating. See Tr. of Hearing on 6/11/02 at 13–15. Because they were in the habit of lying on the rug in the dining room of the house during their sexual encounters, and Rosenblum did not want to stain the rug, he went out to his car and got a blanket from the trunk. He put the blanket on the dining room floor and they engaged in intercourse. After the encounter, he noticed that the blanket was stained. He put the blanket in a kitchen cabinet, retrieved it at some later, unspecified date, and returned it to the trunk of his car. They used the blanket only one time, and, according to Rosenblum, he broke off the affair in mid-December. Rosenblum further claims that he gave the blanket to his attorneys after the lawsuit commenced, and his attorney, Ms. Moscow, states that the blanket remained in the offices of Epstein, Becker & Green, P.C., Rosenblum's lawyers,

---

**1.** The court here summarizes Rosenblum's testimony at the June 11th hearing. As explained *infra*, his testimony represented, for the purposes of his motion to compel, a credible enough account of how his semen and McGrath's menstrual blood could have come to be on the blanket, especially in light of the fact that McGrath did not take the stand at the hearing to refute his testimony. The court does not, however, make any finding as to the actual truth of Rosenblum's claim, a matter for the jury if the issue is raised at trial.

until it was sent to LabCorp for testing. Moscow Aff. at ¶ 5.

At her continued deposition on April 30, 2002, McGrath reiterated her denial that she had ever had "any sexual contact with Eric Rosenblum of any kind, consensual or non-consensual, in any place." See NHCC'S Mem. of Law in Supp., Exh. C at 251, ll. 17–23. On that same date, she related, for the first time, an incident that allegedly occurred in the CEO House. She claimed that she and Rosenblum, who is an attorney, went to the house to discuss a custody dispute he was helping her with, and that as she was leaving the bathroom in the house, he appeared before her naked and ejaculated. See Moscow Letter, May 9, 2002, Exh. B, at 229–30. She said that she pushed him away, got her coat, and left. See NHCC'S Mem. of Law in Supp., Exh. C at 251.

During the April 30 deposition, McGrath acknowledged that she had not related the CEO House incident in any court filings, at her 50–h hearing, or on the first day of her deposition, and explained that she had not previously told anyone but her psychologist about the incident because it was "personally so horrible." See Moscow Letter, May 9, 2002, Exh. B, at 264. Rosenblum's attorney questioned McGrath about whether McGrath knew that, after the first day of McGrath's deposition, Rosenblum had testified at his own deposition that they had had a consensual sexual relationship. Id. at 267. McGrath testified that, although she "had heard that he was going to say that … I don't know for sure what he said at all during his deposition." Id. She also acknowledged that, between her first and second days of deposition, she had learned that her psychologist's records had been subpoenaed, and that she knew the details of her version of the event in the CEO house "was going to come out." [2] Id. at 265.

Later during the April 30th deposition, Rosenblum's counsel, Ms. Moscow, told McGrath's counsel, Mr. Locke, that she was "going to request a DNA sample" from McGrath. See Moscow Aff. in Supp., Exh. A

at 274. Ms. Moscow explained, "I have reason to believe that there is evidence available that contains her DNA obtained in a fashion that's inconsistent with her testimony and consistent with other testimony." Id. When McGrath's counsel sought fuller explanation, the two attorneys spoke off the record, and when they returned to the record, Ms. Moscow stated that "I have a blanket that my client—which I have been advised that has—my client testified that there was a consensual relationship between plaintiff and himself." Id.

As noted above, subsequent to the demand for a DNA sample from McGrath, the plaintiffs moved for a protective order precluding the use of the blanket in the litigation. Rosenblum opposed the motion and cross-moved to compel the DNA sample. The Hospital supported the demand for a DNA sample, and set forth its position on the issues. On May 22, 2002, the undersigned issued an order directing the parties to appear for an evidentiary hearing on June 11, 2002. The May 22nd order reviewed the scant law on the issue of whether the production of a DNA sample can be compelled as part of discovery in a civil lawsuit, and adopted the requirement, discussed in more detail *infra,* that the movant must make a prima facie showing that the DNA sample is warranted, through the introduction of sworn statements and other evidence.

To that end, Rosenblum was ordered to serve and file a memorandum of law, with supporting affidavits, setting forth the necessary proof that a DNA sample should be ordered, and the plaintiff was ordered to submit a memorandum of law in opposition, along with supporting affidavits. Rosenblum was directed, at the very least, to make a credible showing of how the blanket came to be in his possession, why he believes it is stained with Ms. McGrath's blood, and how it will impeach her testimony that they did not have a consensual sexual relationship. Rosenblum submitted, as an exhibit to Moscow's affidavit in support of the motion, a letter from LabCorp stating that preliminary

---

**2.** Indeed, McGrath's psychologist's notes dated July 27, 2000 do recount the incident. See Moscow Letter, May 9, 2002, Exh. A.

testing of the blanket revealed the presence of "a major DNA profile consistent with a male source" and "a major DNA profile consistent with a female source." See Moscow Aff., Exh. B. The female DNA profile apparently "revealed positive indications for blood." Id. The lab also stated that the DNA profiles present on the blanket "can be compared to any reference sample submitted," that is, DNA samples from McGrath and Rosenblum. Id.

## DISCUSSION

### 1.) Standards applicable to orders to compel DNA samples in federal civil discovery:

The issue of what standards should apply in determining a motion to compel the production of a DNA sample as part of discovery in a civil lawsuit does not appear to have been addressed in a published opinion from a court in the Second Circuit. A review of the few relevant cases in other jurisdictions does, however, yield insight into the factors that courts should consider in making such determinations.

A Louisiana appellate court upheld an order requiring the defendant to produce a DNA sample, and allowed DNA testing in a sexual harassment suit, where the plaintiff had alleged that the defendant had ejaculated on her skirt in an act of sexual harassment, and she made a prima facie showing of a reasonable possibility that defendant's semen was present on her skirt. See Hargrave v. Brown, 783 So.2d 497, 499, 501 (La.Ct.App. 2001). The Hargrave court looked at three factors in reaching its decision. First, the court determined that authority existed under state law for ordering the DNA sample, inasmuch as a state statute authorized the discovery of "any matter not privileged which is relevant to the subject matter involved in the pending action," and found that the proposed DNA comparison was highly relevant. Id. at 500.

Next, the court considered whether "the competing interests weigh in favor of permitting the test," and found that they did. Id. Specifically, the court weighed the defendant's privacy rights against "the State's interest in providing a reasonable means or forum for its citizens to resolve disputes, in regulating litigation in the courts, and in protecting its citizens from discrimination in the workplace." Id. The court found that the sample, which could be obtained in a blood test or a cheek swab, represented only a minimal intrusion on the defendant's privacy rights, and concluded that the State's interests outweighed that minimal intrusion. Id. at 500.

Finally, the Hargrave court considered the protection of the defendant's due process rights, noting that a peremptory order would not provide the necessary safeguards, and requiring, instead, that the "the party seeking to compel the [DNA] test must establish a prima facie showing of the reasonable possibility of a match ... before obtaining the requested order." Id. at 500–01. Applying that standard, the court found that the production of plaintiff's skirt with the alleged semen on it, coupled with plaintiff's sworn detailed statements, witnesses' names and verifiable police reports, provided a sufficient showing to meet her burden of making out a prima facie case before obtaining the requested order. Id. at 501.

A federal District Court in Massachusetts recently considered whether to order the production of DNA samples in civil discovery, phrasing the issue as whether ordering the samples would be "beyond the scope of the applicable discovery rules." Harris v. Athol–Royalston Regional Sch. Dist. Comm., 206 F.R.D. 30, 34 (D.Mass.2002). In Harris, a civil rights action, the plaintiff sought DNA samples from both the defendants and nonparties to determine who anonymously sent a packet containing the plaintiff's personnel records to a local newspaper, after a handwriting expert who examined the packet found "hair and ... biological matter clinging to one of the envelopes." Id. at 34. The court declined to order the DNA samples, finding that under the circumstances of the Harris case, DNA testing was beyond the scope of discovery for several reasons, including findings that "DNA testing is an extreme discovery tool which is very intrusive to the targets of such discovery," and that the party seeking the production in Har-

*ris* failed to show a "direct connection linking" the potential DNA samples and the evidence to be tested. *Id.* at 35. The court also based its ruling on the speculative nature of the application, noting that the plaintiff had not "proffered any basis for concluding" that the hair and other matter on the envelope "belonged to the person who sent the packet, rather than someone who opened the packet," or to someone who touched it thereafter. *Id.* The implication of the findings is that if a direct connection had been established, the samples might have been ordered, the alleged intrusiveness notwithstanding.

A New York state court has also addressed and denied an application for a DNA sample in a civil lawsuit, finding that the application was "premature and speculative." *LaVallee v. State of New York Office of Children and Family Svces.*, 182 Misc.2d 58, 60, 696 N.Y.S.2d 670 (Sup.Ct. Dutchess Cty.1999). In *LaVallee*, a sexual harassment action, the plaintiff sought a DNA sample from the defendant, alleging that he had ejaculated on her clothing and shoe and that, after the incident, she had wiped her stained shoe on carpeting in a nearby room. She had thrown away her stained clothing, but sought the sample based on her "strong belief" that the carpet and her shoe contained traces of the defendant's semen. *Id.* at 59, 696 N.Y.S.2d 670.

The court decided the application pursuant to N.Y. C.P.L.R. § 3101(a), "which requires a showing that the desired disclosure be 'material and necessary in the prosecution of an action.'" *Id.* at 59–60, 696 N.Y.S.2d 670. Assuming for purposes of the motion that any semen recovered from the shoe and carpet would be "material and necessary in the prosecution" of the action, the *LaVallee* court nonetheless denied the motion. The court held that, "upon balancing plaintiff's speculative and unsupported 'strong belief' that semen will be recovered from her shoe and in the room into which she fled more than 15 months before, against the invasive nature of the application, the court denies the application as premature and speculative." *Id.* at 60, 696 N.Y.S.2d 670. The court noted, however, that the denial was "without prejudice

to reapplication upon expert proof that semen was recovered from the shoe or the carpet, and in such a quantity and of such quality to allow for accurate DNA analysis of the recovered sample(s). This will ensure that the granting of the application as to [the defendant] if the court were to be so inclined upon reapplication, will not be an academic exercise and an unnecessary invasion of [the defendant's] privacy interests." *Id.* Thus, although the court recognized the potentially "invasive nature" of an order to produce a DNA sample, the denial was based on the plaintiff's failure to demonstrate that a semen sample existed to which the defendant's DNA could be compared, not a blanket rule about DNA samples.

Some general principles regarding the standards applicable to demands for a DNA sample can be elicited from these cases. All three courts look, as a threshold matter, for general authority in the jurisdiction to order a DNA sample and testing. Each of the courts also considers the privacy interests of the party from whom the DNA sample would come. Finally, each court seeks a sufficient factual basis for finding that production of a DNA sample is warranted. Thus, the courts seem to agree that a showing of a "reasonable possibility of a match," to use the language from *Hargrave*, must be made. 783 So.2d at 501. The *Hargrave* court found that a sufficient showing had been made where the plaintiff made out a prima facie case, based on the plaintiff's verified petition, sworn testimony and the names of other potential witnesses. *Id.* The court in *Harris* phrased the requirement as a "direct connection" between the parties from whom the DNA samples were sought and the evidence to be tested. 206 F.R.D. at 35. The court in *LaVallee* required a connection between the potential sample and the evidence against which it would be tested, denying the request without prejudice to renewal if the plaintiff established that the evidence against which the DNA sample would be tested did in fact contain semen. 182 Misc.2d at 60, 696 N.Y.S.2d 670. Both *Harris* and *LaVallee* denied the motions where the requisite factual basis was not demonstrated.

Implicit in each ruling, of course, is the understanding that a DNA sample is meaningless in a vacuum—the sample must be compared to something to determine if the two DNA profiles match, and there must be some demonstrable possibility that a match will be found. As the court in *LaVallee* noted, parties should not be permitted to engage in fishing expeditions, hoping that some useful evidence might be gleaned from obtaining the DNA sample, nor should they be allowed to use demands for DNA evidence to pressure or intimidate other parties. But, where the party seeking the sample makes the appropriate showing, DNA samples should be available. Applying these principles to this case, the undersigned finds that the defendant has met his burden.

## 2.) Application of the standards to the facts of this case:

### a.) There is authority under the federal rules for ordering a DNA sample.

 As a threshold issue, the court finds that there is authority in the Federal Rules for an order compelling a DNA sample. The federal rules allow a broad scope of discovery, providing that parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, and "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *See* Fed.R.Civ.P. 26(b)(1). There is no doubt that a comparison of Rosenblum's and McGrath's DNA samples to the DNA profiles on the blanket is relevant to the subject matter involved in this lawsuit, where Rosenblum claims that they had a consensual sexual relationship and McGrath has denied it several times under oath. For reasons explained in detail *infra*, the fact that the results of the DNA comparison will be used for impeachment purposes only does not alter the relevance of the testing, or require a denial of the order under the federal rules of discovery.

### b.) The plaintiff's privacy rights will not be unduly affected.

 This court finds that the right of the defendant to impeach the plaintiff's veracity and/or the judiciary's interests "in providing a forum for dispute resolution, [and] in regulating litigation in the courts," outweigh the plaintiff's privacy rights under the circumstances presented. *See Hargrave*, 783 So.2d at 500. In reaching this conclusion, the court notes that it does not agree with the *Harris* court's finding that "DNA is an extreme discovery tool which is very intrusive to the targets of such discovery." 206 F.R.D. at 35. It is not clear from the decision in *Harris* whether that court was referring to the method by which the sample is taken, or to the larger, non-physical, ramifications of a person's being ordered to produce such intimate information about themselves, but this court would not express the level of intrusiveness in such strong language. As to the taking of the sample, this court agrees with the *Hargrave* court that the sample, which can be obtained either in a blood test or a cheek swab, is "only a minimal intrusion on the party's privacy rights." 783 So.2d at 500.

There are, no doubt, privacy issues inherent in the DNA context that go beyond the actual taking of the sample. Nonetheless, such samples can be extremely relevant to the lawsuit, and the imposition of appropriate protections that limit the use of the DNA information sufficiently addresses those privacy concerns.

### c.) The defendant has made a prima facie showing of a reasonable possibility of a match.

 Rosenblum has met his burden of showing a reasonable possibility that the DNA testing is likely to yield a match. First, he has shown that the evidence to be tested—the blanket—actually contains a male and a female DNA profile that can be tested against individual DNA samples.[3]

---

3. This is the showing that was absent in *LaVallee*, and which led to the denial of the motion by that court. The court in *Hargrave* granted the motion absent such a showing, apparently finding that the plaintiff's evidence was sufficiently strong even without this showing.

The letter submitted by Rosenblum from LabCorp states that preliminary testing of the blanket revealed the presence of blood, and the presence of "a major DNA profile consistent with a male source" and "a major DNA profile consistent with a female source." See Moscow Aff., Exh. B. The lab also stated that the DNA profiles "can be compared to any reference sample submitted."

The defendant has shown not only that there is something to test McGrath's DNA sample against, but also that there is some factual basis for believing that a match may be made. As noted *supra*, Rosenblum testified at the hearing as to the specific incident that allegedly resulted in the semen and blood stains on the blanket. Although certain details of his account strike the court as odd, his account was, on its face, credible for the purposes of his motion. McGrath did not take the stand to refute any of the details that Rosenblum presented. Thus, without finding that the story the defendant told is true, and noting that the actual testing may or may not reveal a match of the blood on the blanket with McGrath's DNA, the court finds that the defendant has shown, through his affidavit and testimony at the hearing, a reasonable possibility that such a match may be found.

In making this finding, the court rejects the plaintiffs' arguments that the defendants have failed to present sufficient credible evidence to corroborate Rosenblum's claim, and that the motion must be denied because the supporting allegations are uncorroborated. See Pl. Mem. of Law in Opp. at 14–17. Each of the plaintiffs' arguments is addressed *infra.*

### i.) Rosenblum's evidence is sufficient.

The plaintiffs argue that "Rosenblum's letter from Labcorp is insufficient to warrant DNA testing." Id. at 14. The court does not agree. Although the letter from the lab fails to answer several of the questions raised by the plaintiffs, for example, whether the blood was menstrual blood or other blood,[4] whether the semen and blood were deposited on the blanket at the same time, and whether the semen on the blanket is Rosenblum's, it is sufficient for the purposes of this discovery motion.

### ii.) The defendant need not establish a chain of custody of the blanket for purposes of this motion.

■ The court also finds the plaintiffs' claim that the defendant's failure to establish a sufficient chain of custody for the blanket provides a basis for denying the motion to be without merit. In making this argument, the plaintiffs rely on *People v. Rokita*, 316 Ill. App.3d 292, 249 Ill.Dec. 363, 736 N.E.2d 205 (2000). In *Rokita*, the defendant, who was convicted of rape, had petitioned for post-conviction DNA testing using a technique not available when he was first tested. The trial court denied the request, and Rokita appealed. The plaintiffs state that *Rokita* cites to "725 ILCS 5/116–3 recognizing that in order to make a 'prima facie' showing in support of DNA testing in post-conviction proceedings, the chain of custody of the DNA must be established and identity must be central to the criminal conviction." Pet. Mem. in Supp. at 12. The relevance of that finding to the motion before this court is not readily apparent. In any event, this court finds that, on the facts before it, a chain of custody need not be established for the blanket. The plaintiffs have not suggested any concrete ways in which the DNA evidence might have been tampered with to lead to inaccurate results. And, any challenges to the chain of custody of the blanket can be raised in the context of whether the blanket can be admitted as evidence, a determination to be made by the trial judge. The court does hold, however, that the defendant will have to establish a chain of custody for the DNA samples to be submitted by Rosenblum and McGrath, in order to insure the integrity of the testing results. See Conclusion, *infra.*

---

4. At the hearing, the defendant informed the court that the DNA testing could not demonstrate that the blood on the blanket is menstrual blood, only whether the DNA profile of the blood matched McGrath's DNA profile. In the event that a match is found, the plaintiffs will be free to offer argument as to how any sample of McGrath's blood came to be on a blanket in Rosenblum's possession.

### iii.) Corroborative evidence of the sort suggested by the plaintiffs is not required to make out a prima facie showing of a reasonable possibility of a match.

Nor does the court agree with plaintiffs that the defendant's motion must be denied because there is no evidence to corroborate Rosenblum's allegation that he and McGrath were involved in a consensual sexual relationship. Id. at 15. Plaintiffs base this argument on, *inter alia*, Rosenblum's failure to tell Amy Ventry, the outside counsel hired by NHCC to investigate McGrath's sexual harassment claims, about the affair. This does not strike the court as evidence that Rosenblum is necessarily lying. Indeed, it is altogether possible that the Hospital had rules prohibiting such activity between its Chairman of the Board and a hospital employee, and it was in Rosenblum's best interests at the time to conceal the affair. In any event, his failure to reveal it to Ms. Ventry does not make the allegation so suspect as to require a denial of the motion.

Moreover, the cases on which the plaintiffs rely, notably *Hargrave*, do not require corroborative evidence, as suggested by plaintiffs. The court in *Hargrave* found that the plaintiff there had made a prima facie showing of a reasonable possibility of a DNA match, based on the plaintiff's verified petition, sworn testimony and the names of other potential witnesses. 783 So.2d at 501. It did not, however *require* corroborative evidence or the names of witnesses who could corroborate the plaintiff's claim. Although such evidence might well enhance a movant's showing, requiring such evidence would impose too heavy a burden.

### iv.) Results of DNA testing need not be limited to use in establishing liability.

Finally, the plaintiffs argue that the relevant caselaw stands for the proposition that, in order to make a prima facie showing, the party seeking the DNA must intend to use it to demonstrate liability, not for impeachment purposes. See P. Mem. of Law in Supp. at 11–13. This court does not agree that the

cases stand for that proposition, and, even if they did, this court would reject such a rule.

The plaintiffs cite to *Hargrave* as "ordering that a DNA sample be produced where the sample ... would be used to prove liability." P. Mem. of Law in Supp. at 12. While it is true that the plaintiff in *Hargrave* intended to use the result of the DNA test to prove liability, nothing in the decision suggests that such a use was essential to the holding. The same is true as to *Harris* and *LaVallee*. The plaintiffs also rely on *Sacramona v. Bridgestone/Firestone, Inc.*, 152 F.R.D. 428 (D.Ma.1993), a cased cited to in *Harris*.

In *Sacramona*, a personal injury action, the defendants learned during discovery that the plaintiff was a former drug abuser and was bisexual, and was arguably at high risk for HIV or AIDS. The defendants sought a blood sample from the plaintiff to determine his HIV status, arguing that his HIV status had a bearing on his life expectancy, which in turn was relevant to his claims for damages. 152 F.R.D. at 430. In denying the request, the court analogized the demand for a blood sample to a physical examination under Fed. R.Civ.P. 35(a), and noted that, pursuant to that rule, the movant had to "make an affirmative showing that the [party's physical] condition is genuinely in controversy and that good cause exists for ordering a particular examination." Id. at 431. The court found that, on the record before it, "the relevance of the results from a compelled blood test to plaintiff's cause of action is too attenuated," and the defendants sought to engage in " 'wholly exploratory operations in the vague hope that something helpful will turn up.' " Id. (quoting *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 187 (1st Cir.1989)). Thus, the court reasoned, the information the defendants sought was not relevant under Rule 26, and the court would exercise its discretion to limit defendants' discovery. Id.

The *Sacramona* court also held that the plaintiff had not placed his life expectancy "in controversy," as required by Rule 35, and distinguished other cases where blood tests were ordered to determine causation. "In contrast," the court held, "in the instant ac-

tion defendants seek the blood test to determine future damages, not liability." *Id.* The *Sacramona* court's holding that the plaintiff in that personal injury action had not placed his HIV status in controversy for purposes of Rule 35 is a far cry from holding that an HIV blood test, or, by extension, a DNA sample, can never be ordered where it will be put to any use other than to prove liability. This court finds that *Sacramona* does not stand for the proposition advanced by the plaintiffs and is inapposite to the facts presented by the Rosenblum motion.

Thus, the court finds that Rosenblum has made a prima facie showing of a reasonable possibility of a match.

### 3.) Rosenblum's alleged discovery violations:

#### a.) Rosenblum's failure to produce the blanket as part of his initial disclosure does not require the denial of his motion.

The plaintiffs argue that, even if Rosenblum is found to have made a prima facie showing, he should be precluded from using the blanket for any purpose, because he failed to disclose it as part of his Rule 26(a)(1)(B) disclosure obligation and cannot be permitted to conduct a "trial by ambush." See P. Mem. of Law in Opp. at Pts. II & III & 5/6/02 Locke Letter. Fed.R.Civ.P. 26(a)(1)(B) requires, *inter alia*, the disclosure of "all … tangible things that are in the possession, custody or control of the party and that the party may use to support its claims or defenses, unless solely for impeachment." Rule 37(c)(1) provides that a party who, "without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence … any witness or information not so disclosed." McGrath argues that Rosenblum was required to disclose the blanket pursuant to Rule 26, and that his failure to do so automatically invokes the preclusion sanction of Rule 37. Rosenblum claims that the blanket was exempted from mandatory disclosure under Rule 26, because he intends to use it solely for impeachment purposes, in light of McGrath's denial of a consensual sexual relationship. McGrath argues that such a claim is disingenuous, and that Rosenblum, of necessity, will use the blanket to support his defense to the sexual harassment charge.

As a threshold matter, this court notes that introduction of the blanket as evidence at trial is an issue for the trial judge to determine, and that this order considers only whether the DNA sample should be produced as part of the discovery process. In the May 22nd order, this court found that if the blanket "did contain some evidence of a sexual relationship between Rosenblum and McGrath, it could be used to impeach her statement that no such relationship existed." The court further noted that the existence of a consensual sexual relationship is not a per se defense to the harassment claim, a position expressly adopted by Rosenblum's counsel at the hearing. In other words, Rosenblum acknowledges that the fact of a consensual relationship between himself and McGrath does not prove that the sexual harassment did not occur, and adheres to his claim that he will use the results of the DNA testing only to impeach.

The court finds that the circumstances surrounding the revelation of the blanket, which was not mentioned until after McGrath had several times denied a consensual relationship, support the defendant's claim that the blanket will be used by Rosenblum for impeachment purposes only, and the court grants the motion compelling the production of the DNA sample on the assumption that Rosenblum will indeed be limited to that use at trial, if the trial judge allows the evidence in. The ultimate determination of that issue, will, however, as noted above, be made by the trial judge. In any event, given the defendant's claim that the blanket will be used only for impeachment purposes, the preclusion set forth in Rule 37(c)(1) does not apply, because Rule 26(a)(1)(B) expressly excludes evidence that will be used only for impeachment purposes from the mandatory disclosure requirements.

The NHCC argues that, even if the blanket were precluded from use by Rosenblum, such a sanction could not apply to the hospital, because it was unaware of the blanket's

existence until it was mentioned at McGrath's recent deposition, and the hospital was under no obligation to produce it. The NHCC further argues that the DNA evidence would be relevant for both impeachment purposes and "for establishing a defense that any complained of conduct by Rosenblum was not 'unwelcome' sexual harassment." NHCC Mem. of Law in Supp. at 4. At the hearing, Rosenblum's counsel argued that the hospital cannot enter a defense on behalf of the individual defendant, and thus could not use the DNA evidence to support this claim. This court need not decide the issue however, because the use to which the NHCC may or may not put the DNA evidence will be determined by the trial judge.

**b.) Rosenblum's failure to produce his correspondence with LabCorp is not sanctionable.**

 The plaintiffs also argue that Rosenblum's failure to produce the correspondence between himself and LabCorp should be sanctioned by preclusion of the blanket as evidence, pursuant to Rules 34 and 37. P. Mem. of Law in Opp. at 19–20. The court disagrees. As Rosenblum's attorney argued at the hearing on June 11th, he did not have to identify LabCorp as a witness because it is being used for impeachment purposes. See Rule 26(a)(1)(B) & Tr. at 5. And, any correspondence between LabCorp and Rosenblum's attorneys is protected by the work product doctrine (see Tr. at 5), unless the plaintiffs make an argument that they have substantial need of the materials and face undue hardship in obtaining the substantial equivalent of the materials, an argument the plaintiffs have not made. See Fed.R.Civ.P. 26(b)(3).

## CONCLUSION

The court finds that the defendant has met his burden of establishing a prima facie showing of a reasonable possibility of a match between the DNA profiles on the blanket and his and McGrath's DNA profiles. Thus, both Rosenblum and McGrath shall submit DNA samples for testing. The defendant has noted that the sample can be taken "at a location that minimizes the [in]convenience to McGrath, such as her home or

office, so long as a qualified medical person takes the sample." Def. Mem. of Law in Supp. at 6, n. 1. The parties shall determine whether they prefer to give a blood sample or a cheek swab, and the court directs that the samples be taken by a "qualified medical person," for example, a LabCorp representative, in a manner that will safeguard the integrity of the samples and will guarantee that the samples submitted to LabCorp are, in fact, the samples taken from Rosenblum and McGrath. In this regard, prior to taking the samples, the parties are to submit a joint proposed order that outlines the procedures to be followed, to be So Ordered by the undersigned, within ten days of the date of this order, or, if the plaintiffs appeal this order, within ten days of the date of disposition of that appeal by the trial judge.

Pursuant to the plaintiffs' request at the hearing, this order is stayed for ten days from the date of the order, to give the plaintiffs time to appeal it to Judge Platt, if they choose to do so. If the plaintiffs do appeal this order within the ten days, the stay is extended to ten days from the date of disposition of the appeal by the trial judge.

The parties are also reminded that a settlement conference has been scheduled for **July 2, 2002 at 2:00 p.m.**

**SO ORDERED.**